

**U.S. DEPARTMENT OF JUSTICE**

**Matthew T. Kirsch**
*Acting United States Attorney*
*District of Colorado*

*1801 California Street, Suite 1600*   *(303) 454-0100*
*Denver, CO  80202*

November 27, 2024

**VIA EMAIL**

| | |
|---|---|
| Marci LaBranche | Gene Rossi |
| John Graham | Carlton Fields |
| Stimson LaBranche Hubbard, LLC | 1025 Thomas Jefferson St., NW, Suite 400W |
| 1652 N. Downing Street | Washington, DC 20007-5208 |
| Denver, CO 80218 | Email: GRossi@carltonfields.com |
| Email: labranche@slhlegal.com | |
| | Katherine Hartigan |
| **Attorneys for Chrisheena McGee** | Hartigan Law, LLC |
| | 1563 N. Gilpin St. |
| | Denver, CO 80218 |
| | Email: khm@hartiganlawllc.com |
| | |
| | **Attorneys for Sandra Bacon** |

Re:   United States v. Chrisheena McGee et al., 23-cr-00472-DDD
      Notice Pursuant to Fed. R. Crim. P. 16(a)(1)(G)

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government hereby provides you with the below and attached disclosures relating to expert witnesses the government intends to call as witnesses at trial pursuant to Rules 702, 703, and 705 of the Federal Rules of Evidence. Pursuant to Rule 16(b)(1)(C), and consistent with the Discovery Conference Memorandum and Order, *see* ECF No. 17, the government requests reciprocal disclosures for any expert witness the defense intends to call at trial. The Government may amend or update these disclosures.

At this time, the government intends to call two expert witnesses at trial. Out of an abundance of caution, the government also provides notice for a third witness who the government intends to call as a lay witness.

EXHIBIT A

1. **Angela Crooker, CFE, Manager, Virginia Bureau of Insurance, Agent Regulation Division, Real Estate Settlement Agents ("RESA") Investigations Section.**

    a. <u>Complete Statement of All Opinions:</u>  Attached in Section I is a signed report that provides a complete statement of the opinions Ms. Crooker is expected to testify to at trial.

    b. <u>Bases and Reasons for Opinions:</u>  The bases and reasons for Ms. Crooker's opinions are set forth in the attached disclosure.

    c. <u>Witness's Qualifications and Publications:</u>  Ms. Crooker's qualifications and her publications are set forth in the attached disclosure.

    d. <u>Other Testimony:</u>  Ms. Crooker has not testified as an expert in any other trial or deposition in the last four years.

    e. <u>Payments:</u>  Ms. Crooker is not being paid for her testimony but will be reimbursed for expenses related to her travel and testimony.

2. **Alexander Scoufis, JD, Assistant General Counsel, FINRA, Criminal Prosecution Assistance Group.**

    a. <u>Complete Statement of All Opinions</u>:  Attached in Section II is a signed disclosure, which provides a complete statement of the opinions Mr. Scoufis is expected to testify to at trial.

    b. <u>Bases and Reasons for Opinions</u>:  The bases and reasons for Mr. Scoufis's opinions are set forth in the attached disclosure.

    c. <u>Witness's Qualifications and Publications</u>: Mr. Scoufis's qualifications and publications are set forth in the attached disclosure.

    d. <u>Other Testimony</u>:  Mr. Scoufis's prior testimony is set forth in the attached disclosure.

    e. <u>Payments</u>:  Mr. Scoufis is not being paid for his testimony but will be reimbursed for expenses related to his travel and testimony.

The government also intends to call FBI Forensic Accountant Lindsay Fryer to testify regarding the summaries and charts she prepared and the calculations she performed for exhibits the government will seek to admit under Federal Rule of Evidence 1006 related to thousands of pages of financial records, including bank and credit union records. Although trained as an accountant and thus familiar with the documents she reviewed, Ms. Fryer will not be relying on accounting expertise. Rather, she will simply relay her percipient observations of documents she personally reviewed and the arithmetic used to summarize bank transactions. This kind of summary evidence—essentially creating bank spreads and then summarizing the data inside of them—is not expert testimony and is familiar to any lay person who has tried to summarize their own personal finances. *See, e.g.*, *United v. Hamaker*, 455 F.3d 1316, 1332 (11th Cir. 2006) (concluding that FBI financial analyst testified as lay witness when he did basic math while

summarizing business records, even though years of expertise and computer software "may have made him more efficient" at that task); *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) (concluding that FBI financial analysis testified as a lay person when she summarized business records and presented them in condensed form, as contemplated by Federal Rule of Evidence 1006). While the testimony the government will elicit on these subjects is permitted under Rule 701, it provides Ms. Fryer's disclosure (in Section III) out of an abundance of caution to satisfy the requirements of Rule 16(a)(1)(G).

       Respectfully,

       MATTHEW T. KIRSCH
       Acting United States Attorney

*s/ Craig Fansler*  
Assistant U.S. Attorney  
U.S. Attorney's Office  
1801 California St., Ste. 1600  
Denver, CO 80202  
Telephone: 303-454-0100  
Fax: 303-454-0401  
E-mail: Craig.Fansler2@usdoj.gov  
Attorney for the Government  

*s/ Bryan Fields*  
Assistant U.S. Attorney  
U.S. Attorney's Office  
1801 California St., Ste. 1600  
Denver, CO 80202  
Phone: (303) 454-0100  
Fax: 303-454-0401  
Email: Bryan.Fields3@usdoj.gov  
Attorney for the Government  

Attachments:
Section I – Angela Crooker
Section II – Alexander Scoufis
Section III –Lindsay Fryer

**Appendix to United States' Notice of Expert Witness Disclosures Pursuant to Fed. R. Crim. P. 16(a)(1)(G)**

    **I.**    <u>**Angela Crooker, CFE**</u>

The government intends to call Angela Crooker as an expert on the role and duties of escrow agents.

    *A.*    *Qualifications*

Ms. Crooker is a manager at the Virginia State Corporation Commission's Bureau of Insurance, in its Real Estate Settlement Agents ("RESA") Investigations Section. In over 11 years with this Section, she has, among other duties, supervised investigations of escrow agents and settlement agencies, trained RESA investigators on best practices for escrow agents using the American Land Title Association's ("ALTA") best practices and Virginia statute and audit guidelines, conducted investigations of escrow agents, and participated in the National Association of Insurance Commissioners (where she assists other regulatory bodies in combating fraudulent and unfair real estate settlement activities). Her qualifications are further set forth in her curriculum vitae, which was provided as EXP_00000005-06, and which is fully incorporated by reference.

Crooker has not previously testified as an expert witness. She has not authored any publications in the previous 10 years. A relevant presentation she has given, titled "Common Problems in RESA Investigations," is available online. If the government learns of any new testimony or publications by Ms. Crooker between today's date and the date of trial, it will promptly notify the defense.

    *B.*    *Bases and Reasons for Opinions*

1

Ms. Crooker based her opinions on her education, training, experience, examination of escrow agreements to which the defendants are parties, and analysis of transactions in Bacon's escrow accounts.

C.   *Summaries, Opinions, and Conclusions*

Ms. Crooker's testimony will aid the jury in understanding the role and duties of escrow agents—also referred to as settlement agents in Virginia—who are entrusted with escrow funds. Ms. Crooker will testify generally about the role, duties, and best practices of escrow agents. She is familiar with the statutes and regulations governing escrow agents in Virginia, where Bacon was a licensed settlement agent in Virginia, and with ALTA's best practices for operating nationwide. The United States notes that some of Ms. Crooker's anticipated testimony may be properly deemed fact witness testimony, as opposed to expert testimony.

It is anticipated that Ms. Crooker will testify about the following topics and may use examples or analogies from her own work to further explain the topics set forth below:

1.   <u>Role and function of escrow agents</u>

Ms. Crooker will testify that the role of an escrow agent is to be an impartial third party between a lender and a borrower. She will testify that an escrow agreement provides written instructions to the escrow agent for how escrow money can be used, and that an escrow agreement specifies the limited conditions or events that allow disbursement of the money.

Ms. Crooker will explain that the role of an escrow agent is a limited one: to perform administrative and clerical functions related to the collection of documents and the collection and disbursement of funds required to carry out the terms of the escrow agreement.

She will testify that persons engaged in large lending transactions—such as real estate or construction loans—use escrow agents to hold advance fees or deposits safely and securely,

2

outside of the control of either party, until the closing of the loan. She will explain that states including Virginia have laws and regulations, and that a national association (ALTA) publishes best practices, to ensure that escrow agents are aware of their duties and obligations when holding escrow money.

### 2. Licensing process for escrow agents

Ms. Crooker will testify that, to become a licensed settlement agent in Virginia, Bacon had to obtain a license as an individual or as an agency. She will provide fact witness testimony that Bacon obtained an agency license for First Title Inc. and that this license required an initial registration and renewal every two years. Each license renewal required Bacon to make a number of attestations, including that she had reviewed the applicable statutes and regulations for escrow agents operating in Virginia. Ms. Crooker will testify about the date that Bacon first registered for a state license, each date of renewal, the attestations on each renewal application, and the date Bacon's license expired.

### 3. Duties of escrow agents

Ms. Crooker will provide expert testimony about various duties of escrow agents, including:

- *Duty to maintain a license*. Ms. Crooker will testify that settlement agents must continuously maintain their license if they want to administer escrow accounts.

- *Duty to exercise reasonable care*. Ms. Crooker will testify that an escrow agent's duty to exercise reasonable care includes a duty to exercise financial responsibility over escrow funds, not to disburse funds for any purpose outside of the specific purposes authorized by the escrow agreement, not to commingle escrow money for separate transactions that occur in different states, and to routinely reconcile escrow bank accounts. She will testify about the red

3

flags to an auditor or investigator that indicate that an escrow agent has not exercised reasonable care.

- *Duty to manage escrow funds in a fiduciary capacity*. Ms. Crooker will testify that escrow agents have a fiduciary duty to act in the best interest of the borrower who deposits escrow funds until conditions in the escrow agreement authorizing transfer of the escrow money to the lender are satisfied. She will testify that this duty means that funds can only be applied or disbursed according to the terms of the individual escrow agreement under which the funds were given to the escrow agent. She will explain that the escrow agreement specifies at what stage—typically, at the closing stage—the escrow money ceases to belong to the borrower and is transferred to the lender. While the money is held in escrow, Ms. Crooker will testify that an escrow agent has a duty to segregate escrow funds in a separate escrow trust account at an FDIC-insured institution, disburse the funds only in accordance with written instructions in the escrow agreement, and may not disburse funds for other purposes. For example, if not authorized by the escrow agreement, escrow agents cannot use escrow money to pay operating expenses or to benefit themselves, either party to the agreement, or third parties.

- *Duty to not commingle funds*. Ms. Crooker will testify that part of the duty to maintain escrow funds in a fiduciary capacity in a separate trust account is that an escrow agent must not commingle a client's escrow money with other funds, and that not maintaining separate accounts can violate the duty to act as a fiduciary. She will explain that an escrow agent occupies a position of trust: maintaining this trust that the escrow agent is acting in accordance with the terms of the escrow agreement and not for the benefit of either party is paramount to safeguarding the credibility of the profession and the individual escrow agent.

4

- *Duty to avoid conflicts of interest*. She will testify that the role of an escrow agent is limited to clerical and administrative functions. Escrow agents who go beyond these functions can create conflicts of interest and violate their duty to act in a fiduciary capacity. She will explain red flags when investigating whether conflicts of interest exist, such as the use of escrow money to pay operating expenses of the escrow agent's or the lender's business, refusals to make escrow bank account records available for inspection and audit, or written or oral agreements between the escrow agent and the lender that conflict with the terms of an escrow agreement for which the escrow agent has agreed to act as a neutral third party. To limit conflicts of interest, Ms. Crooker will testify that it is a best practice—and required under Virginia laws familiar to Bacon—that the person or entity that deposits the escrow money is given their choice of escrow agent and is not required to use a lender's preferred escrow agent.

- *Duty to perform account audits*. Ms. Crooker will testify that escrow agents have duties to respond promptly to requests for examination of records of their escrow bank accounts. For example, escrow agents in Virginia are required to permit the RESA Investigations Section to examine all records relating to the escrow accounts and conduct audits of these accounts, and the escrow agent must retain records related to deals with which the escrow agent is involved.

- *Duty to retain records of their business activities*. Ms. Crooker will testify that a best practice for escrow agents is to maintain sufficient records of their activities to ensure compliance with each of their duties, and that many states require retention for specified lengths of time. For example, in Virginia, a settlement agent must retain records for each settlement for at least five years from the closing of a real-estate deal. *See* Va. Code § 55.1-1011. If the closing never occurs—*e.g.*, the deal never closes and the escrow money is instead returned—the settlement agent must still maintain records for a period of time after the money is returned.

5

- *Duty to reconcile accounts*. Ms. Crooker will testify that maintaining a separate trust account for escrow funds is necessary for an escrow agent to comply with operating and account reconciliation best practices. Escrow agents should reconcile escrow accounts monthly, during which they should verify that no client escrow money was used for any purpose in violation of the escrow agreement. States including Virginia specify operating requirements for conducting this reconciliation of escrow trust accounts, and Ms. Crooker will testify about the importance of these requirements for ensuring that escrow agents remain neutral and comply with their fiduciary and other duties as an escrow agent.

4. <u>Bacon's knowledge of duties as escrow agent</u>

Ms. Crooker will testify that all escrow agents licensed in Virginia are required to be familiar with the above duties, and that Bacon attested in an initial registration in 2015 and in renewal applications in 2016 and 2018 that she was familiar with and would adhere to all RESA Virginia statutes and regulations related to her duties as an escrow agent. Ms. Crooker will further testify that Virginia's duties are consistent with ALTA's best practices, and that the basic duties of escrow agents are consistent across states.

5. <u>Duties created by escrow agreements where Bacon acted as escrow agent</u>

As part of her testimony, Ms. Crooker will review certain escrow agreements signed by Bacon and explain to the jury the written conditions and instructions in these agreements to escrow agents. She will testify about how auditors or regulators would monitor compliance with the specific written instructions.

Ms. Crooker will review the conditions in the escrow agreements related to return of money and testify that it is common for escrow agreements to specify permitted uses of escrow money and procedures to return the money if a deal collapses or fails to close by a specified

6

deadline. She will explain how the best practices she discussed ensure that escrow money is kept safe and secure so that it can be returned if specified conditions are not met.

      6.      <u>Red flags in Bacon's escrow bank accounts</u>

Based on review of transactions in Bacon's escrow bank accounts, Ms. Crooker will testify about transactions that are inconsistent with best practices or that would be red flags to an auditor or investigator reviewing these accounts. Ms. Crooker will testify that, when an auditor or investigator sees red flags such as large transfers to third parties using escrow money, the investigator would review the escrow agent's file, including any escrow agreement, to verify whether the agreement authorized such large transfers.

<u>Witness's Approval & Signature</u>

I have reviewed and approve of the summary of my qualifications and anticipated testimony.

_/s/ Angela Crooker_                                   November 26, 2024
Angela Crooker, CFE

**II.     Alexander Scoufis**

The government intends to call Alexander Scoufis as an expert on advance-fee and Ponzi schemes.

A. *Qualifications*

Mr. Scoufis is Counsel for the Criminal Prosecution Assistance Group ("CPAG") of the Financial Industry Regulatory Authority ("FINRA"). He joined FINRA in 2015 and has served as an attorney with FINRA's CPAG since 2016. From 2015 to 2016, Mr. Scoufis worked as an investigator in the Office of Fraud Detection and Market Intelligence. Mr. Scoufis's additional qualifications and experience are set forth in his curriculum vitae, which was provided as EXP_00000001 and is incorporated by reference. A list of cases in which Mr. Scoufis has testified in the last four years was provided as EXP_00000002.[1]

B.     *Bases and Reasons for Opinions*

Mr. Scoufis will draw upon publicly available data, data and research available to FINRA staff, his training as a FINRA investigator and attorney, his experience from prior investigations, and his review of the discovery in this case.

C.     *Summaries, Opinions, and Conclusions*

Mr. Scoufis will testify about the structure and regulation of financial markets and about definitions and common characteristics of advance-fee and Ponzi schemes. He will describe how those schemes work, including testifying about the following common characteristics of advance-fee and Ponzi schemes, which may be supplemented at a later date:

---

[1] Mr. Scoufis has also testified at sentencing hearings, but because such testimony is not "at trial or by deposition," the United States does not list it here. *See* Fed. R. Crim. P. 16(a)(1)(G)(iii).

- Perpetrators of advance-fee and Ponzi schemes often maintain at least some legitimate business operations. The existence of legitimate business operations does not indicate the absence of financial fraud. Rather, the existence of such operations often helps lend an air of legitimacy to an advance-fee or Ponzi scheme and ultimately allows it to grow and remain undetected for a longer period of time.

- Ponzi schemes often have an origin story, where perpetrators may start out engaging in some legitimate activities or one type of fraud scheme, such as an advance-fee fraud scheme, before turning to a Ponzi scheme as the perpetrators lose money, fall behind, or become unable to make payments to earlier investors.

- The commingling of investor funds is a common red flag when investigating advance-fee and Ponzi fraud schemes. When investments from different sources are comingled, especially when such comingling is combined with a lack of transparency and refusal to provide account statements to verify proof of funds, it increases the risk that investor funds may be used contrary to the agreed-upon purpose.

- It is common for advance-fee and Ponzi schemes to hold out as financial professionals who have clean records as third-party neutrals, when in fact these seemingly neutral parties are insiders involved in the fraud scheme. Utilizing a seemingly neutral party whose job title or reputation engenders trust is a common feature of advance-fee and Ponzi schemes because it induces additional investment and creates an air of legitimacy that can help conceal or delay discovery of the true nature of the Ponzi scheme.

9

- Self-dealing, undisclosed loans to insiders, or side agreements between one party to the agreement and a supposed third-party neutral are red flags for examiners and investigators of financial fraud. He will explain that such transactions raise conflict-of-interest issues because the transactions may not have undergone sufficient scrutiny and may harm investors while benefitting insiders to the fraud scheme.

- Advance-fee and Ponzi schemes commonly involve fabricated documents to mislead or lull investors. For example, financial fraud schemes may include instances where documents are backdated. Backdated documents can be used to purport to satisfy obligations to third parties, explain delays in funding, or mislead investors about the true value of their deposits or investments or the capital of the perpetrator of the fraud. Similarly, fabricated documents that appear to come from credible third parties—such as financial institutions or attorneys—are often provided to investors to legitimize the investment or to misrepresent to investors that a trustworthy institution will fund or vouch for the transaction and has partnered with the perpetrators of the fraud scheme.

- As losses from a Ponzi scheme mount, perpetrators of the scheme often have to triage demands from various anxious investors to conceal the true nature of the scheme and prevent its discovery for a longer period of time. For example, some investors may threaten legal action or referrals to government regulators, and it is common for perpetrators to return some or all of the principal paid by those threatening imminent action that may lead to discovery of the scheme over more

recent investors who are not an immediate threat to the scheme's continued success.

- Lulling communications promising imminent payment of funds are common in financial fraud schemes. Because Ponzi schemes depend on lining up new investors and the perpetrators of such schemes often experience delays in lining up these new investors, it is common for the perpetrators to use lulling communications to reassure earlier investors that payment is imminent to both appease the investors or forestall demands to return advance fees or investments. It is a red flag to investigators when lulling communications are used regularly or when they offer excuses that blame third parties or are otherwise difficult for investors to verify.

- It is common in financial fraud schemes for perpetrators to deploy financial buzzwords or nonstandard financial documents to explain delays and to reassure investors that they will receive their promised funding or return on investment. For example, perpetrators of an advance-fee or Ponzi scheme may provide financial instruments such as standby letters of credit or blocked-funds guarantees to reassure investors into believing their investment is safe. Similarly, perpetrators often appease anxious investors by providing bank statements to show proof of funds or documents purporting to show access to outside sources of funding (such as foreign banks) or by attributing delays to current events or trends (such as the COVID-19 pandemic, complications of international wire systems, or bank closures).  The repeated use of financial instruments or reliance on

11

- buzzwords and external trends to justify delays in funding is a red flag to an examiner or regulator during audits and investigations.
- It is a red flag to investigators when a perpetrator frequently shifts explanations to investors about the status of an investor's advance fees or refuses to provide account statements establishing proof of funds.
- Perpetrators using multiple agents or employees to try to legitimize delays on a promised return on an investment is a red flag to investigators. The involvement of additional parties can create the appearance of legitimacy and deflect attention from the primary perpetrators of a scheme.
- It is a red flag to investigators when a perpetrator uses an alias while interacting with investors or clients. Additionally, it is common in Ponzi schemes for a perpetrator to create multiple entities with distinct names. These related entities often interact with clients and customers but fail to disclose the entities' similar ownership, operation, and business purpose.

Based on Mr. Scoufis's review of in this case, he will apply these common characteristics of advance-fee and Ponzi schemes to the discovery in this case and testify about red flags in communications and documents issued by the defendants and their companies.

Mr. Scoufis will testify about the significance of representations that are made to investors. He will testify that a business must accurately disclose information to investors in financial contracts and in correspondence. He will explain that fabricated documents or misrepresentations help conceal and perpetuate financial fraud.

The United States notes that some of Mr. Scoufis's anticipated testimony may be properly deemed fact witness testimony, as opposed to expert testimony.

12

Witness's Approval & Signature

I have reviewed and approve of the summary of my qualifications and anticipated testimony.

*[signature]*                                                                November 27, 2024

Alexander Scoufis

13

**III.       Lindsay Fryer, CPA, CAMS, CFE**

The government intends to call Lindsay Fryer as a lay witness to testify about the financial analysis she performed. Ms. Fryer is included in this disclosure out of an abundance of caution and to promote efficiency by allowing defendants to raise any objections far before trial.

*A. Qualifications*

Ms. Fryer has been a Forensic Accountant with the Federal Bureau of Investigation and has been assigned to the Complex Financial Crimes Squad since March 2019. Ms. Fryer holds both a bachelor's degree in accounting and a master's degree in accounting from the University of Denver. She is a Certified Public Accountant (CPA) licensed in the state of Colorado. She also holds the Certified Anti-Money Laundering Specialist (CAMS) credential from the Association of Certified Anti-Money Laundering Specialists (ACAMS) and the Certified Fraud Examiner (CFE) credential from the Association of Certified Fraud Examiners (ACFE). Ms. Fryer's qualifications are further set forth in her curriculum vitae, which was provided as EXP_00000007-08 and is incorporated by reference.

Ms. Fryer has not authored any publications in the past ten years. During the previous 4 years, she has testified as an expert at trial or by deposition in the following cases:

- May 2022 - *21CR483 Div.: 11 THE PEOPLE OF THE STATE OF COLORADO v. BRET LAMPERES*. Ms. Fryer testified as an excerpt witness at the Preliminary Hearing regarding her review of the financial records for this case.
- January 2024 - *People v. Top Dollar Pawn, LLC – D0212022CR003298, et al. - Mischa Jargowsky*. Ms. Fryer testified as an excerpt witness at the Jury Trial regarding her review of the financial records for this case.

14

- July 2024 - *People v. Top Dollar Pawn, LLC – D0212022CR003298, et al. – Jack Jargowsky*. Ms. Fryer testified as an excerpt witness at the Jury Trial regarding her review of the financial records for this case.

   B.   *Bases and Reasons for Opinions*

Ms. Fryer's testimony is based on her education, training, and experience, as well as her review of the applicable materials noted herein.

Ms. Fryer created summary charts that will be provided pursuant to the disclosure deadlines based on her review of bank records. The bank records she has reviewed, which may be supplemented as trial approaches, include records for the following individuals/entities:

- First Title, Inc.
- 4TS Acquisitions
- The Bacon Group
- John L. Bacon
- Sandra L. Bacon
- Chrisheena S McGee
- KC Gull Industries Trust, Chrisheena S McGee TTE

   C.   *Summaries, Opinions, and Conclusions*

Ms. Fryer will testify she reviewed bank records and then used Excel spreadsheets to sort the information and create summaries of the voluminous documents. She will testify that she used Excel functions to add and subtract relevant values to produce charts and graphs.

Ms. Fryer will testify she followed funds as they passed through several bank accounts to determine the disposition of specific victim funds deposited into First Title, Inc. bank accounts.

15

Ms. Fryer will also provide lay opinion testimony about certain categories of transactions contained in the bank records and explain why she associated transactions with certain individuals or categories.

Witness's Approval & Signature

I have reviewed and approve of the summary of my qualifications anticipated testimony and/or bases for my testimony.

*Lindsay Fryer*                      November 27, 2024
Lindsay Fryer

16