# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-472-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. CHRISHEENA SHANTE MCGEE a/k/a Christina Marius,

    Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America, by and through Craig Fansler and Kurt Bohn, Assistant United States Attorneys for the District of Colorado (the "government"), and the defendant, Chrisheena Shante McGee ("McGee" or the "defendant"), personally and by counsel, Marci LaBranche, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.  AGREEMENT

### A.    Defendant's Plea of Guilty:

The defendant agrees:

    (1)    to waive indictment and plead guilty to an Information charging a violation of 18 U.S.C.§ 371, conspiracy to violate 18 U.S.C. § 1343;

    (2)    to waive certain appellate and collateral attack rights, as explained in

Court Exhibit
1

detail below;

(3)     to be liable for restitution, as detailed below, which could include joint and several liability for some or all of the amount with other co-conspirators; and

(4)     not to contest forfeiture, as more fully described below.

## B.      The Government's Obligations:

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). At the time of sentencing, the government agrees that it will move to dismiss all counts in the indictment as to this defendant. The government further agrees not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, file an indictment with additional charges.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees (1) that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a), (2) to file a motion for a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b), and (3) to recommend a term of imprisonment in the applicable guideline range calculated by the court at sentencing.

If the defendant engages in conduct which implicates USSG §§ 3C1.1 cmt. n. 4 between the guilty plea and sentencing in this case, in addition to any other

2

consequences, the government will be released from its obligations under the plea agreement, and the defendant will not thereby have any right to withdraw from the plea agreement.

## C.    Defendant's Waiver of Appeal:

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

> (1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 371;
>
> (2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 25; or
>
> (3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. §

3

2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The United States agrees not to argue a procedural bar to a prosecutorial misconduct claim raised in a § 2255 petition based on the failure of the defendant to raise that issue on direct appeal.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply, and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

4

## D.   Restitution and Forfeiture of Assets:

The defendant agrees that 18 U.S.C. § 3663A applies, acknowledges that a restitution order is mandatory, and consents to entry of an order of restitution in an amount of at least $7,955,332.97, jointly and severally with any co-conspirators convicted in this case or 25-cr-00025-DDD.

The defendant admits the forfeiture allegations in the Information. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to:

- a) All funds seized from Wells Fargo Bank account #8070532661 in the name of KC Gull Industries Trust Christeen S. McGee TTE;
- b) 2021 BMW X6, bearing vehicle identification number #5UXCY6C02M9E26909;
- c) 2016 Cadillac Escalade, bearing vehicle identification number #1GYS3DKJ5GR265560; and
- d) A money judgment in the amount of the proceeds obtained by the defendant's conspiracy.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his/her

5

rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him/her if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of wire fraud are as follows:

Conspiracy, 18 U.S.C. § 371:

    A.    The defendant agreed with at least one other person to violate the law.

    B.    One of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

    C.    The defendant knew the essential objective of the conspiracy.

    D.    There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[1]

Wire Fraud, 18 U.S.C. § 1343:

    A.    The defendant devised a scheme to defraud;

    B.    The defendant acted with specific intent to defraud;

    C.    The defendant used, or caused another person to use, interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

    D.    The scheme employed false or fraudulent pretenses, representations, or promises that were material.[2]

---

[1] Tenth Circuit Criminal Pattern Jury Instructions, 2025 Edition, § 2.19.

[2] Tenth Circuit Criminal Pattern Jury Instructions, 2025 Edition, § 2.57.

### III. STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of 18 U.S.C. § 371 is: not more than five years of imprisonment, a fine of not more than the greater of $250,000 or twice the gain or loss from the offense, or both; not more than 3 years of supervised release; a $100 mandatory victim's fund assessment fee; and restitution in the amount of at least $7,955,332.97, plus interest accruing through the date of sentencing.

### IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V. STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

8

McGee resided in Louisiana until approximately May 2019 and in Texas from approximately June 2019 through at least July 2021. During this time, McGee held herself out as operating numerous businesses, including: (a) Branded Asset Management Group; (b) Gold Brand Trust; (c) First Allegiance Capital; (d) KC Gull Industries Trust; and (e) Champion Lending. McGee also used aliases including Christina Marius.

## The Conspiracy

In May 2019, McGee and her co-conspirator, Sandra Bacon, began operating a business in which they promised to obtain funding for entities seeking large capital loans. Working with others, McGee and Bacon obtained advance fees from potential borrowers with the intent to obtain standby letters of credit and other funding opportunities for the borrowers. By October 2019, however, no funding had been obtained, and significant amounts of money had been lost or spent on operating expenses. Thus, McGee and Bacon began to try and find other ways to find funding or repay their potential borrowers, resulting in the instant conspiracy.

McGee and Bacon recognized that they did not have funds to repay earlier potential borrowers who had already paid advance fees. Nor did they have the money to fund those earlier potential borrower's loans. Thus, beginning in October 2019 and lasting until March 2021, McGee knowingly conspired and agreed with co-defendant Sandra Bacon, and others, to falsely represent to new potential borrowers that McGee and the companies she operated had in fact obtained access to funds in order to induce them to provide additional advance fees. McGee and Bacon then used the new

advance fees to repay earlier entities whose loans did not fund.

As a result of these intentionally false representations made by McGee and her companies after October 2019, six victims (listed as Victims 5-10 in the indictment in this case) entered into escrow agreements in which they agreed to pay approximately $10,712,500 in advance fees:

| Victim | Date(s) of Fee Payment(s) (on or about) | Total Advance Fees Paid |
|---|---|---|
| 5 | December 3 - 9, 2019 | $ 1,252,500 |
| 6 | March 11, 2020 | $ 450,000 |
| 7 | June 16, 2020 | $ 2,000,000 |
| 8 | July 9, 2020 | $ 300,000 |
| 9 | June 10, June 17, and September 2, 2020 | $ 2,210,000 |
| 10 | August 20, 2020 - November 4, 2020 | $ 4,500,000 |
| Totals | December, 2019 - November 4, 2020 | $ 10,712,500 |

The parties agree that the losses to Victims 1 through 4 occurred prior to McGee joining the conspiracy and are not included in the loss amount but that McGee still agrees to pay restitution for net losses to Victims 1-4.

To obtain the advance fees, McGee falsely represented to entities seeking loans that she had access to sources of money to fund loans of up to $150,000,000. She falsely represented that she would obtain the capital if victims would pay an advance fee—often about 10% of the total loan amount—into an escrow account managed by Bacon. McGee and Bacon falsely represented to those victims that Bacon would hold in escrow advance fees paid to secure the loans until the loans were funded. However, those funds were used to repay earlier potential borrowers. When victims—or persons associated with each victim—asked to use a different escrow agent, McGee stated that she would only provide funding if Bacon served as escrow agent.

Each escrow agreement contained false representations about how the advance fee would be used. These false representations included, among others, that Bacon would hold advance fees in escrow, invest advance fees in T-Bills to earn interest if full funding was not provided by a specified date, return the advance fee upon request, or apply the advance fee to the loan amount at closing. Upon receiving these promises, individuals and businesses including Victim 5, a resident of Aspen, Colorado, paid advance fees to Bacon.

During the Advance-Fee Scheme, McGee's role included drafting the escrow agreement and negotiating conditions related to the release and distribution of escrow funds. Bacon's role included signing escrow agreements and accepting advance fees as the escrow agent who controlled escrow bank accounts. As escrow agent, she was responsible for ensuring that advance fees were not released from escrow accounts prematurely. Despite her promises and obligations related to the escrow money, it was part of the Advance-Fee scheme that McGee and Bacon impermissibly spent or transferred advance fees while falsely representing that Bacon continued to hold advance fees in escrow.

When upset earlier potential borrowers began to demand return of their advance fees or threaten lawsuits, McGee and Bacon began using advance fees collected from new victims to pay earlier potential borrowers in a Ponzi-like fashion.



| Victim | Funds from Victim(s) to First Title Navy FCU | Payments to Victims From Victim Funds | | | | | Total | Net |
|---|---|---|---|---|---|---|---|---|
| | | Victim 10 | Victim 9 | Victim 8 | Victim 7 | Victim 5 | | |
| Victim 1 | $ (1,500,000.00) | | | | | | $        - | $ (1,500,000.00) |
| Victim 2 | $ (1,088,502.74) | | | | $  289,000.00 | $ 800,000.00 | $ 1,089,000.00 | $      497.26 |
| Victim 3 | $ (1,000,000.00) | | | | $   25,000.00 | | $   25,000.00 | $  (975,000.00) |
| Victim 4 | $  (500,000.00) | | | | $  550,000.00 | | $  550,000.00 | $   50,000.00 |
| Victim 5 | $ (1,252,500.00) | $  128,700.00 | | | | | $  128,700.00 | $ (1,123,800.00) |
| Victim 6 | $  (450,000.00) | | | | $  450,000.00 | | $  450,000.00 | $        - |
| Victim 7 | $ (2,000,000.00) | $ 1,000,000.00 | $ 1,210,000.00 | $  35,000.00 | | | $ 2,245,000.00 | $  245,000.00 |
| Victim 8 | $  (300,000.00) | $  312,000.00 | | | | | $  312,000.00 | $   12,000.00 |
| Victim 9 | $ (2,210,000.00) | $ 2,000,000.00 | $  250,000.00 | $ 150,000.00 | $   90,000.00 | | $ 2,490,000.00 | $  280,000.00 |
| Victim 10 | $ (4,500,000.00) | $  143,467.03 | | | | | $  143,467.03 | $ (4,356,532.97) |
| | $ (14,801,002.74) | $ 3,584,167.03 | $ 1,460,000.00 | $ 185,000.00 | $ 1,404,000.00 | $ 800,000.00 | $ 7,433,167.03 | $ (7,367,835.71) |

Net Loss
$ (7,955,332.97)

McGee provided commitment letters, emails, and text messages to victims and entities seeking loans reassuring them of her and her companies' commitment to provide the full loan funding by a certain date and falsely represented, among other things, that advance fees would remain in escrow until closing and applied to the total loan amount at that time.

When victims and entities seeking loans sought reassurance from McGee and Bacon that their money remained in escrow, McGee and Bacon falsely represented that they still held in escrow the advance fees and could return them upon request. For example, on June 9, 2020, Bacon told a broker for Victim 5 that McGee could not spend Victim 5's escrow money because "I won't let her." In reality, Bacon had already transferred, and knew she had transferred, over 97.8 percent of Victim 5's money out of escrow—much of it at McGee's direction—nearly six months earlier, by December 12, 2019. McGee, for her part, told victims she had requested that Bacon return advance fees, despite knowing there was nothing to return, such as the following text message she sent on January 30, 2020:

**1/30/2020 5:27 PM (Viewed 1/30/2020 5:28 PM)**
Christine Martus [Branded Asset Management Group] (9854008881)

I have given every ounce of update and have requested the return of escrow as well. I have sent over the letter and there is absolutely nothing else. I have worked on this for you and our other client all day and just stopped for dinner

After committing to deliver loan funding by a specific closing date, McGee would delay loan closing dates multiple times under false pretenses, such as stating

that the delay was caused by her lawyers, the time needed to acquire a financial institution, or bank processing procedures, *e.g.*:

January 14, 2020

Application Number : 07210087139

Dear ▮Victim 4▮

▮▮▮

We appreciate your patient during our time of funding transition. The purpose of this letter is to provide an updated closing protocol. We are in the process of acquiring a financial institution in which ▮Victim 4▮ is listed as one of the initial clients to receive funding through the acquisition in the amount of $1,865,000. The funds have been allocated and currently in transition with the acquisition. Our goal is to have this initial project completely funded by January 31, 2020.

If you have any questions, please do not hesitate to call my office directly at ▮▮▮

Christina Marius

McGee and Bacon represented that Bacon would hold advance fees in escrow despite transferring, or directing the other to transfer, this money out of an escrow account within days or weeks of receipt.    For example:

      a.     Within days of Victim 5 paying $1,252,500 to Bacon across two payments in December 2019, Bacon transferred $800,000 of Victim 5's money to Victim 2, an earlier victim of the Advance-Fee Scheme.

      b.     The same day Bacon received $700,000 from Victim 10—based in Idaho Springs, Colorado—to hold in escrow, she wired $312,000 of Victim 10's money to Victim 8, an earlier victim of the Advance-Fee Scheme.

      c.     Bacon transferred over $800,000 of victim escrow money to

McGee and to companies related to McGee.    For example, McGee used approximately $198,526.25 of victim escrow money to purchase real property, approximately $90,854.24 to purchase a BMW, and approximately $30,159 to purchase a Cadillac Escalade.

When victims and entities seeking loans requested updates about loan status from McGee, she produced fabricated proof-of-fund statements and pre-approval letters to falsely represent that McGee and her businesses had sufficient money to close the loans and return escrow money, including the following:

    a.    In a letter dated April 3, 2020, McGee falsely represented that a single-branch Alabama bank had pre-approved a loan of $10 million that would fund a loan related to Victim 5. In reality, the bank had no communications or relationship with McGee and had not provided pre-approval. McGee used the fabricated letter to falsely represent she had the bank's backing.

    b.    On or about February 10, 2021, after Victim 10 requested proof of funds from McGee, she emailed a broker for Victim 10 a bank statement purporting to show her business bank account had a balance of over $7 million. In reality, the bank account had a balance of less than $14,000. McGee provided a fabricated bank statement to create the appearance that her company's bank account had sufficient funds to cover the first loan installment

owed to Victim 10.

To conceal their fraud, lull victims into a false complacency, and delay lawsuits, McGee and Bacon falsely represented to victims and entities seeking loans that they had secured new funding sources or had received deposits sufficient to fund outstanding loans and were only awaiting final approvals and processing by third parties such as lawyers, accountants, banks, and wire transfer services.

## Total loss

The parties agree that the loss amount for purposes of § 2B1.1 attributable to the defendant related to Victims 5-10 is $5,480,332.97, which includes credits against loss related to the eventual return of some victims' advance fees.[3]

McGee also understands and agrees to pay restitution based on net loss to earlier potential borrowers including Victims 1-4 who lost money, in an amount totaling $7,955,332.97 before prejudgment interest. She also understands and agrees that additional expenses related to victims' participation in the investigation or prosecution of the offense may be part of the restitution judgment if submitted in advance of sentencing. *See* 18 U.S.C. § 3663(b)(4). She also agrees that restitution will include the prejudgment interest on $7,955,332.97 through the date of

---

[3] USSG § 2B1.1 app. note 3(D)(i) provides that loss is reduced by money returned to the victim before the offense is detected. While possible that facts could emerge after the plea agreement that money was returned to some victims because and not before the offense was detected, the government has not developed such evidence presently and will maintain its recommendation as to loss if such facts emerge after entry of the plea agreement.

sentencing, with interest calculated based on the Treasury Bill rate.

The defendant agrees that overt acts in furtherance of the conspiracy occurred in Colorado, including that the victims received phone calls and messages in Colorado and payment of advance fees occurred from bank accounts in Colorado. She further agrees that the phone calls and emails identified in the Information were wires transmitted in interstate commerce.

## VI.   GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government also has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

A.      Under § 2X1.1 (conspiracy) the applicable guideline is that for the

17

substantive offense, plus any adjustments for such guideline. The substantive offense if wire fraud.

B.  The base guideline is § 2B1.1, with a base offense level of 6. § 2B1.1(a)(1).

B.  An 18-level increase applies because the loss was more than $3,500,000 but less than $9,500,000. § 2B1.1(b)(1)(J).

C.  A 2-level increase applies because the scheme involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. §2B1.1(b)(10)(C).

E.  A 2-level increase applies because the defendant was an organizer, leader, manager, or supervisor in a criminal activity that did not involve five or more participants and was not otherwise extensive. § 3B1.1(c).

F.  The adjusted offense level is 28.

G.  The defendant should receive a 3-level downward adjustment for timely acceptance of responsibility. § 3E1.1(a)–(b).

H.  The resulting total offense level is 25.

I.  The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the

18

parties, it is estimated that the defendant's criminal history category would be II.

J.   The career offender/criminal livelihood/armed career criminal adjustments would not apply.

K.   The advisory guideline range resulting from these calculations is 63-78 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 57 months (bottom of Category I) to 137 months (top of Category VI). The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.

L.   Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

M.   Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

N.   Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses, which the parties agree will be an amount of at least $7,955,332.97, plus interest accruing through the date of sentencing. The restitution

19

may increase depending on documentation submitted by victims during the sentencing process.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

1.11.26

Date

CHRISHEENA MCGEE
Defendant

1.12.26

Date

MARCI LABRANCHE
Attorney for Defendant

1/15/26

Date

CRAIG FANSLER
KURT BOHN
Assistant U.S. Attorneys

21